[S. F. No. 6385. In Bank.—June 18, 1915.]

## F. A. HIHN COMPANY, Appellant, v. CITY OF SANTA CRUZ and UNION TRACTION COMPANY, Respondents.

Municipal Corporations—Land Lying Between Ordinary and Extraordinary High-tide Lines—Action to Quiet Title—City of Santa Cruz—Source of Title.—One claiming title to a parcel of beach land lying between the line of ordinary high tide and that of extraordinary high tide under a deed from the trustees of the inhabitants of the town of Santa Cruz acting under authority of the act of Congress approved July 23, 1866, can recover in an action to quiet title against the city of Santa Cruz claiming title as grantee of the state of California under the act of March 21, 1872. The source of such title is the United States and not the state of California.

Id.—Tide-lands—Ownership by State of California.—When a state is formed it becomes by virtue of its sovereignty the owner of all lands within its borders covered by navigable waters and of the adjoining tide-lands which comprise those below the line of ordinary high tide.

Id.—Lands Lying Between Ordinary and Extraordinary High-tide Lines—Ownership by the United States.—Upon succession of the United States to the sovereignty of Mexico the title which the Mexican government had to lands lying between the lines of ordinary and extreme high tide became vested in the United States.

Id.—Lands not Held in Private Ownership—United States as Source of Title—Treaty of Guadalupe Hidalgo.—By the treaty of Guadalupe Hidalgo the title to all lands in the state of California not held in private ownership became vested in the United States.

Id.—City of Santa Cruz—Claim to Pueblo Lands—Presentation to Board of Land Commissioners.—Whatever claim the city of Santa Cruz may have held as successor of the Mexican Pueblo de Figueroa, to the land involved in this action as part of its pueblo lands, lapsed because such claim to pueblo lands was not presented to the board of land commissioners as required by the act of Congress of March 3, 1851.

Id.—Pueblo Lands—Lands Held for Use of Inhabitants—Claim not Presented to Board of Land Commissioners—Subject to Disposition of the United States.—The claim of the city of Santa Cruz based on the right of the pueblo to control the lands involved in this action for the common use of the inhabitants as beach lands for access to and from the water, even if it was not necessary to present such claim to the board of land commissioners under the

act of Congress of March 3, 1851, is not well founded, because the inchoate claim of the pueblo was subject to the disposition of the United States government which has disposed of such lands by the act of Congress of July 23, 1866.

ID.—CITY OF SANTA CRUZ—ADVERSE POSSESSION OF LAND FOR HIGHWAY—EXTENT OF EASEMENT.—As to the part of this land known as the "esplanade," the claim of the city of Santa Cruz to title by adverse possession is sustained by the facts that the city went upon the land, took possession of it under claim of right, erected improvements upon it covering the entire surface, changed its character so as to render it unfitted for anything but a public highway, and maintained it as a highway, which gave to the city an easement co-extensive with such use.

ID.—EASEMENT BY USE BY INHABITANTS AND GENERAL PUBLIC DOES NOT INURE TO THE CITY.—A use of land adjacent to the beach by the inhabitants of the city and also by the public generally for walking, bathing, and recreation does not create an easement by prescription in favor of the city.

ID.—ADVERSE POSSESSION BY ENFORCEMENT OF ORDINANCES ON PRIVATE LAND.—The mere fact that the city passed ordinances regulating the use of its public lands and that its officials undertook to enforce those ordinances on private property falls far short of fulfilling the requirements of an adverse possession.

ID.—PLEADING AND PRACTICE—ANSWER—FINDINGS AND ISSUES IN THE CASE.—In an action to quiet title a finding of dedication to public use where dedication is not pleaded in the answer is outside the issues of the case.

ID.—EASEMENTS—DEDICATION TO PUBLIC USE—INFERENCE OF INTENT—LICENSE.—In order to constitute a valid dedication there must be an intention on the part of the owner to devote his property to public use and although such intent may be inferred from long acquiescence in a use by the public, where the land is uninclosed and uncultivated the fact that the public has habitually gone on the land will be attributed to a license rather than to an intent to dedicate.

ID.—PUBLIC SERVICE CORPORATIONS—ACTION TO QUIET TITLE.—Where the owner of land, over which a city has acquired all the rights which a municipality has in a public highway, takes no steps to prevent a street railway company from going upon the land and instituting and operating a street-railway under authority of the city, the owner of such land cannot prevent such use of the land for street-railway purposes in an action to quiet title thereto.

APPEAL from a judgment of the Superior Court of Santa Cruz County and from an order refusing a new trial. Lucas F. Smith, Judge.

The facts are stated in the opinion of the court.

Cushing & Cushing, and Charles B. Younger, for Appellant.

H. A. van C. Torchiana, W. P. Netherton, J. Leslie Johnston, City Attorney, and Stratton, Kaufman & Torchiana, for Respondents.

SLOSS, J.—The plaintiff brought this action to quiet its title to a parcel of land in the city of Santa Cruz. The defendant city answered, asserting title, as successor to the state of California, to a portion of the land described in the complaint, and alleging, further, a twenty years' adverse possession of such portion of the tract. In addition, it alleged that for more than twenty years prior to the commencement of the action, the city of Santa Cruz and its predecessor, the town of Santa Cruz, together with the inhabitants thereof, had been using all of the lands thus claimed by the city as and for recreation grounds, public parks, playgrounds, bathing beach, and shore ground for the use and benefit of the inhabitants of said city.

The Union Traction Company asserted its ownership of a right of way over the land claimed by the city for railroad purposes, and set up that it had for more than twenty years been in open, notorious, adverse, and peaceable possession of such right of way under a claim of right.

The findings of the court were in favor of the defendants. The court found that the plaintiff was not the owner of that portion of the land to which the city of Santa Cruz had asserted title in its answer, but was the owner of the remainder of the lot described in the complaint. It is found that the plaintiff based its claims of title upon a deed from the trustees of the inhabitants of the town of Santa Cruz to the California Powder Works, dated December 7, 1869, said trustees acting under the authority of an act of Congress approved July 23, 1866, [14 Stats. U. S. 209, 2 Fed. Stats. Ann., p. 852]. The findings go on to set forth a summary of the history of the city of Santa Cruz, successor to the town of Santa Cruz, which in its turn was the successor of certain Mexican pueblos. It is then declared in the findings that under the terms of the civil law the Republic of Mexico was sovereign over all lands up to extreme high-water mark, except in a pueblo, in which

case said pueblo had a qualified right in said lands. That at the time of the cession of California to the United States the beach lands were public lands impressed with the public character of beach lands situate in a Mexican pueblo. That the state of California was the successor to the sovereign rights of the Republic of Mexico and exercised the right of ownership over the same jointly with the municipal authorities of the pueblo and afterwards of the town of Santa Cruz. That the lands described in the answer of the city were all situate below the extreme high water line. That at the time of the passage of the act of Congress before referred to the Congress of the United States had no authority or right to dispose of said lands.

It is further found that at the time of the passage of the act of Congress and the making of the conveyance by the trustees, the land now claimed by the city belonged to the state of California as tide, beach, and shore lands, subject to the qualified right of the town of Santa Cruz as successor to the Mexican pueblo de Figueroa to maintain said lands as public beach lands. The findings refer to the act of the legislature of the state of California passed on the twenty-first day of March, 1872, [Stats. 1871–72, p. 472], whereby all tide-land within the corporate limits of the town of Santa Cruz between high and low tide was dedicated as public grounds and title thereto was granted to the corporate authorities of the town of Santa Cruz in trust for the use of the public, and declare that since the passage of said act the town of Santa Cruz and its successor the city of Santa Cruz holds and claims title to the lands situate below the extreme high-water line adversely to all the world and in trust for the use of the public as public playgrounds. There is a further finding to the effect that the lands described in the answer of the defendant city are a part of the tract popularly known as "the beach" and that at the time of the incorporation of the town of Santa Cruz in 1866 this beach was and ever since has been used by the public as a public place for exercise, health, and recreation. Part of the land, it is found, is covered by a public highway known as the "esplanade." On said esplanade are situate two tracks of the Union Traction Company which are maintained under a franchise from the city, and are used for the operation of an electric car system. The part of the esplanade not occupied by tracks is used exclusively as a street or highway. Of the portion of

the property in dispute which is not covered by the esplanade a part is covered by a small park maintained at the expense of the city of Santa Cruz and persons other than the plaintiff. The rest of the property in controversy is covered by beach sands and is a public beach used by the public in the same manner as the adjacent beach and has been so used from time immemorial.    Another finding declares that for more than twenty years prior to the commencement of the action and prior to the passage of the act of Congress, the city of Santa Cruz and its predecessor, the town of Santa Cruz, together with the inhabitants thereof, has been and now is the owner and in possession and entitled to the possession of said lands and premises and that said lands were during all of said times and now are recreation grounds, public parks, playgrounds, bathing beach, and shore grounds for the use and benefit of the inhabitants of the said city of Santa Cruz, and have been dedicated to the use of the public.    There is a separate finding supporting the plea of adverse possession on the part of the city and finally a finding in favor of the claim of the Union Traction Company of a right to operate a railway over the tracks upon the property.

The judgment declares that the city is the owner in fee simple entitled to and in possession of the land described in its answer and that its title is quieted against all claims of the plaintiff.    The city is declared to hold the lands in trust for the use of the public as public playgrounds.    The Union Traction Company is declared to be the owner and in possession of a right of way over the line occupied by its tracks.    The plaintiff is declared to be the owner and in possession of all the land claimed by it except the portion to which the city laid claim in its answer.    Costs were awarded to the defendants.

Plaintiff appeals from the judgment and from an order denying its motion for a new trial.

In its answer the city of Santa Cruz based its defense upon two grounds: 1.    That it was the owner of the land as successor to the state of California; and 2.    That regardless of original title, it had acquired ownership by adverse possession. While the findings of the court contain a number of matters outside of the issues raised by the pleadings, there were findings in favor of the defendant city upon both of these claims. We shall first discuss the question of record title, leaving the

issue of adverse possession, and other matters, for subsequent consideration.

The town of Santa Cruz was incorporated by an act of the legislature, approved March 31, 1866 (Stats. 1865–66, p. 547). Section two of this act provides that the corporate powers and duties of the town are to be vested in a board of trustees to consist of three members.

By act of Congress, approved July 23, 1866, referred to in the findings, it was enacted that all the right and title of the United States to the land within the corporate limits of the town of Santa Cruz be relinquished and granted to the corporate authorities of said town and their successors "in trust for and with authority to convey so much of said lands as are in the *bona fide* occupancy of parties upon the passage of this act by themselves or tenants, to such parties." On October 8, 1866, the trustees of the town accepted as the official map and survey of the lands within the corporate limits of the town two maps marked respectively "A" and "B." Map "B" includes the land in controversy, which is embraced in lot No. 6, as designated on the map. On October 23, 1866, the trustees adopted an ordinance providing for the conveyance of lands within the corporate limits of the town. It provides that persons and corporations claiming to have been *bona fide* occupants of the land at the time of the passage of the act of Congress above referred to, shall file with the clerk within a given time their claim and application in writing for a deed from the trustees, the application to be accompanied by an affidavit showing the *bona fide* occupancy of the claimant on the twenty-third day of July, 1866. When such claims have been approved, the board is required by the terms of the ordinance to execute a good and sufficient deed to the applicants. On December 7, 1869, a deed was made by the "inhabitants of the town of Santa Cruz" (the name of the body corporate created by the act of March 31, 1866), and by the "board of trustees thereof" to the California Powder Works of a tract of land described, which is a part of lot No. 6 and embraces the lands in controversy. The plaintiff has by *mesne* conveyances succeeded to the interest of the California Powder Works.

Upon the facts just outlined, which are shown in the record without controversy, the plaintiff claims to be the owner of the record title to the land in dispute. The city's attack

upon this claim is based on the proposition that at the time
of the passage of the act of Congress the part of the property
claimed by the city was owned by the state of California and
that the United States, the original source of plaintiff's title
had, therefore, no title to grant. The city itself claims title
as grantee of the state under the act of March 21, 1872 (Stats.
1871–72, p. 472). That act declares that all of the tide-
lands within the corporate limits of the town of Santa Cruz
"between the line of high and low tide, are hereby dedicated
as public grounds and the title thereto is granted to the cor-
porate authorities of the town of Santa Cruz in trust for the
use of the public. . . ." (See *Santa Cruz* v. *Southern
Pacific R. R. Co.,* 163 Cal. 538, [123 Pac. 362].) The con-
tentions that the ownership was in the state and that title
passed from the state to the city are both based on the alleged
character of the lands as tide-lands. The findings do not dis-
close that the property in dispute is tide-land within the mean-
ing of that expression as used in the act of 1872, or as under-
stood in the decisions dealing with the rights of individual
states in lands bordering upon or underlying navigable
water. When a state is formed of territory originally owned
or acquired by the United States, such state by virtue
of its sovereignty becomes the owner of all lands within its
borders covered by navigable water, and the adjoining tide-
lands. The tide-lands are those below the line of "ordinary
high tide." (*People* v. *Morrill,* 26 Cal. 336, 353; *Tesche-
macher* v. *Thompson,* 18 Cal. 21, [79 Am. Dec. 151] ; *Wright*
v. *Seymour,* 69 Cal. 125 [10 Pac. 323].) The "high-water
mark, which defines the limit of the state's sovereignty, is the
usual or ordinary high-water mark. By that designation we
mean the limit reached by the neap tides—that is, those tides
which happen between the full and change of the moon twice in
every twenty-four hours." (*Teschemacher* v. *Thompson,* 18
Cal. 21, [79 Am. Dec. 151].) The land between this ordinary
high-water mark and the limit of unusual or extraordinary
tides is not under our law included within the tide-lands thus
passing to the state, but such lands remained vested in the
United States as a part of the uplands.

The findings contain no statement that the land in dispute
is below the line of ordinary high tide. They declare, merely,
that the land is below the line of extraordinary high tides.
But since there is a general finding of ownership by the city,

and we are bound to construe the findings so as to support the judgment, we would not be authorized to infer from the findings alone that the land in question is above the line of ordinary high tide. The sufficiency of the evidence to support the findings is, however, attacked and under the evidence there can be no serious claim that the land is in fact below the line of ordinary high tide. The contrary was clearly proven. We must, therefore, consider the validity of the city's claim upon the assumption that the land in controversy is above the line of ordinary high tide and below that of extraordinary high tide.

To support its asserted title the city relies upon the facts found by the court, although not put in issue by any pleadings, to the effect that the city of Santa Cruz is the successor of a Mexican pueblo, which included the disputed parcel of land. It is claimed that under the Mexican law the sovereign right of the government included lands up to the line of extraordinary high tide, subject to a right in the pueblo to control these lands for the use of the public. Eliminating for the moment any question of pueblo rights, the title which the Mexican government may have had in the land between the lines of ordinary and extreme high tides became vested in the United States and not in the state of California. Whatever may have been the extent of the sovereign rights of the Mexican government, those rights all passed, upon cession, to the United States. By the treaty of Guadalupe Hidalgo, the United States became vested with the title to all the lands in California not held in private ownership. (*Thompson* v. *Doaksum,* 68 Cal. 593, [10 Pac. 199].) The state of California, upon its organization, became vested with the rights incident to the sovereignty of the people of each state. The extent of those rights as between the United States and any state of the Union must be measured, not by the Mexican law, but by our own. As we have already said, the lands held by a state in its sovereign capacity in trust for the public uses of navigation and fishery are "the lands lying between the lines of ordinary high and low tide as well as that within a bay or harbor and permanently covered by its water." (*People* v. *California Fish Co.,* 166 Cal. 576, 584, [138 Pac. 79].)

The city cannot, therefore, found a claim of title to the land in controversy upon any grant from the state of California. Has it any rights as successor to a pueblo or pueblos said

to have existed prior to the cession? Although the record contains no evidence directed to this point, the findings deal with the history of these pueblos at some length. We may assume, as is contended by the city, that the courts take judicial notice of the existence of such pueblos. By the law of Mexico pueblos were entitled for their benefit and that of their inhabitants to the use of lands, not exceeding, generally, an area of four square leagues, and of adjoining lands within certain prescribed limits. (*Hart* v. *Burnett,* 15 Cal. 530.) But with respect, at least, to lands which the pueblo held in its proprietary capacity and which it was authorized to dispose of in private ownership to its inhabitants, the pueblo was in the same position as any holder of a private claim, that is to say, it was required to present the claim for confirmation under the act of Congress of March 3, 1851, [9 Stats. U. S. 631]. (*Stevenson* v. *Bennett,* 35 Cal. 424.) Under this statute, a failure to present the claim within the time limited made the land a part of the public domain. This requirement of presentation to the commission applied to every claim of ownership (*Botiller* v. *Dominguez,* 130 U. S. 238, [32 L. Ed. 926, 9 Sup. Ct. Rep. 525]), and not merely, as had been held in some earlier decisions of this court (*Minturn* v. *Brower,* 24 Cal. 644, 663 ; *Phelan* v. *Poyoreno,* 74 Cal. 448, 452, [13 Pac. 681, 16 Pac. 241]), to those which were imperfect or inchoate. There was no proceeding for confirmation in the case of the pueblos in question.

The claim based on the asserted right of the pueblo to control the land for the common use of the inhabitants as beach lands for access to and from the water has no better standing, even if we grant that this, as a public right, was not within the scope of the act of 1851. Under the Spanish and Mexican law the title of the pueblo was not an indefeasible estate. It amounted "to a little more than a restricted and qualified right to alienate portions of the land to the inhabitants for building or cultivation, or both, or to use the remainder for commons, for pasture lands, or as a source of revenue, or for other public purposes. The right of this possession and use was in all particulars subject to the control of the government. They would be held by the pueblo or city in trust for the benefit of the inhabitants, and its right of disposition was subject to be modified and taken away by the government." (*Baker* v. *Brickell,* 87 Cal. 329, 334, [25 Pac. 489, 1067] ; *Grisar* v. *Mc-*

*Dowell,* 6 Wall, 364, [18 L. Ed. 863].)   In *United States* v. *Santa Fe,* 165 U. S. 675, 707, 711, [41 L. Ed. 874, 17 Sup. Ct. Rep. 472], the supreme court of the United States said that "it cannot be doubted that under the law of Spain it was necessary that the proper authorities should particularly designate the land to be acquired by towns and pueblos, before a vested right or title to the use thereof could arise." (There is no suggestion in this case that any such designation had been made with respect to the alleged pueblos occupying the site of the present city of Santa Cruz.) "Moreover," the court goes on to say, "the general theory of the Spanish law on the subject indicates that, even after a formal designation, the control of the outlying lands, to which a town might have been considered entitled, was in the king as the source and fountain of title, and could be disposed of at will by him or by his duly authorized representative, as long as such lands were not affected by private rights." Finally the court refers to "the unquestioned power lodged in the king of Spain to exercise unlimited authority over the lands assigned to a town and undisposed of and not the subject of private grant (to all of which rights the United States succeeded as successor of the king of Spain and the government of Mexico)." This view of the measure of the rights of a pueblo in its common lands is restated and reaffirmed in *United States* v. *Sandoval,* 167 U. S. 278, 295–297, [42 L. Ed. 168, 17 Sup. Ct. Rep. 868]. (See, also, *Holladay* v. *San Francisco,* 124 Cal. 352, [57 Pac. 146].)

It follows that the city cannot assert the supposed claim of the pueblo as against the title of the plaintiff. Whatever right the pueblo had, became subject to the absolute power and control of the government of the United States. That government disposed of the lands by the act of July 23, 1866, and the plaintiff, succeeding to the title of the United States under the provisions of that act, has accordingly shown a perfect title. The deed of the trustees to the California Powder Works is *prima facie* evidence that the grantee was in *bona fide* occupancy on the date of the passage of the act of Congress of July 23, 1866, and was therefore entitled to receive the conveyance. This evidence could not be disputed by the city, or by any other claimant not connecting himself with the title of the United States, under which the grantees of the town

trustees claim. (*Galvin* v. *Palmer,* 113 Cal. 46, 53, [45 Pac. 172].)

Before entering upon a discussion of the questions raised by the plea of adverse possession, it will be necessary to describe briefly the situation and physical condition of the property in controversy. This piece of land runs east and west for a length of several hundred feet and is about one hundred and fifty feet in width. Its southerly line is over one hundred feet northerly of the line marking the limit of ordinary high tide. The intervening space is sand beach. The esplanade referred to in the findings occupies the northerly portion of the land claimed by the city, and covers a width of about seventy-five feet, widening at the easterly end of the property into a small park. The portion of the disputed tract lying south of the esplanade and park is a sandy flat similar in character to that of the adjoining beach. The esplanade is a paved street or boulevard, built by filling in upon the sand, and is lined with posts for lights. The esplanade itself was built in 1903 under a contract made by the city and the cost of construction was paid by the city. Prior thereto there had been a board walk covering a part of the width of the esplanade, and this too had been constructed and maintained by the city. The tracks of the Union Traction Company run over this esplanade. They were constructed in the same place prior to the building of the esplanade and the lines were and are operated under franchises granted by the city. All of the surface of the esplanade, except the portion occupied by these tracks, has always been used as a public highway. There is ample evidence that this part of the land was used in the same manner prior to the construction of the esplanade. The action was commenced in 1909, more than five years after the esplanade had been constructed.

It cannot be questioned that these facts not only support, but would require a finding of an interest in the city by adverse possession, so far as the esplanade is concerned. The city went upon the land, took possession of it under a claim of right, erected upon it improvements occupying the entire surface, changed the character of the land so as to render it unfit for any .other use than that of a public highway and maintained it as such highway. We cannot imagine what more would be required to constitute adverse possession by a city of land claimed by it as a public highway. The fee may still re-

main in the plaintiff but the city owns at least an easement coextensive with the use made by it under its authority. To the extent that the findings show the city's ownership of such an interest in the esplanade, they find support in the evidence. The small space occupied as a park is governed by similar considerations.

The question whether the evidence supports the findings of adverse possession with regard to the land lying south of the esplanade presents different considerations. This part of the tract was never improved by any form of permanent structure. It was left open with nothing to distinguish it from the adjacent tide lands. The deed of the city to the California Powder Works established the fact that at the date of such deed December 7, 1869, said powder works was in actual occupancy of the land. For many years the public has been in the habit of going upon and across this land in the same manner in which the adjoining tide land was used; that is to say, the sandy stretch composing the beach was used for walking, bathing, and other recreation. Plaintiff and its predecessors never interposed any objection to such use. There was evidence, further, that the city had passed various ordinances regarding the obstruction of public beaches and like matters, and that these ordinances had been enforced on this land as well as elsewhere along the beach. This evidence was not sufficient to establish the city's ownership of a prescriptive right in the land. The use by the public would not vest an interest in the city for the reason, among others, that the use was by the public generally, not merely by the inhabitants of Santa Cruz. The mere fact that the city passed ordinances regulating the use of its public lands and that its officials undertook to enforce those ordinances on private property certainly falls far short of fulfilling the requirements of an adverse possession. We attach no importance to the testimony of various gentlemen, former mayors of Santa Cruz, to the effect that the city always claimed title to this land. These declarations amount to nothing more than the conclusions and opinions of the witnesses.

Whether the facts shown establish a dedication of the land to the public use for pleasure grounds is a question that might be dismissed with the simple statement that the answer did not set up a dedication and that the finding in this regard was outside of the issues. But beyond all this, we think the evidence was not such as to support a finding of dedication. In

order to constitute a valid dedication, there must be an intention on the part of the owner to devote his property to the public use. (*California Navigation Co.* v. *Union Transportation Co.,* 126 Cal. 433, [46 L. R. A. 825, 58 Pac. 936] ; *Niles* v. *Los Angeles,* 125 Cal. 572, [58 Pac. 190].) It is true that this intent may be inferred from long acquiescence in a use by the public. (13 Cyc. 455.) But where land is uninclosed and uncultivated, the fact that the public has been in the habit of going upon the land will ordinarily be attributed to a license on the part of the owner, rather than to his intent to dedicate. (13 Cyc. 484.) This is more particularly true where the user by the public is not over a definite and specified line, but extends over the entire surface of the tract. (13 Cyc. 484.) It will not be presumed, from mere failure to object, that the owner of such land so used intends to create in the public a right which would practically destroy his own right to use any part of the property. (*Dyce* v. *Hay,* 1 Macqueen 305. See, also, *Pearsall* v. *Post,* 20 Wend. (N. Y.) 111.)

There remains for consideration the part of the judgment in favor of the Union Traction Company. All that this defendant claims and all that was given it by the decree was a right of way for railway purposes over the lands occupied by its tracks. That land is entirely within the limits of the esplanade, in which, as we have seen, the city has acquired all the rights which a municipality has in a public highway. The traction company is operating its lines under the authority of the city, and the franchises granted by the city justify the judgment in favor of the traction company. In addition, the plaintiff having taken no steps to prevent this defendant from going upon the land and instituting and operating a public service, cannot now maintain an action for the purpose of stopping that service, but is limited to an action for damages for the trespass, if any there was. (*Fresno Street Railroad Co.* v. *Southern Pacific Co.,* 135 Cal. 202, [67 Pac. 773] ; *Southern California Railway Co.* v. *Slauson,* 138 Cal. 342, [94 Am. St. Rep. 58, 71 Pac. 352].)

The result of these views is that the judgment in favor of the city of Santa Cruz cannot stand. The suggestion that this court modify this part of the judgment cannot be adopted. Any new or modified judgment would require the support of findings different from those already made, and this court has, of course, no power to make such findings.

The judgment in favor of the traction company is, however, supported by findings which are in accord with the evidence. There is no reason for interfering with this part of the judgment.

We have not discussed certain rulings on evidence, claimed by the appellant to have been erroneous, as we think the views we have expressed will suffice for a ready and correct determination of the material issues upon a new trial.

The judgment and the order denying a new trial are affirmed, in so far as they are in favor of the defendant Union Traction Company; in all other respects, they are reversed.

Shaw, J., Lorigan, J., Melvin, J., and Henshaw, J. concurred.