[S. F. No. 1298. Department One.—May 3, 1899.]

S. W. HOLLADAY, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Respondent.

PUEBLO LANDS OF SAN FRANCISCO—TITLE OF UNITED STATES—QUALIFIED RIGHTS OF CITY.—The title to the unappropriated pueblo lands of San Francisco passed to the United States upon the conquest of California in 1846; though the city, as successor of the pueblo, had an inchoate and imperfect right thereto, qualified as a trust for the benefit of the inhabitants of the city, and subject to governmental control. The city could not alienate the lands in violation of the trust; nor could it by ordinance divest the power of Congress to modify its inchoate rights. The lands were confirmed to the city by Congress, with such restrictions as it chose to impose, and for the uses and purposes specified in the ordinances of the city ratified by the state legislature March 11, 1858.

ID.—OPERATION OF VAN NESS ORDINANCE—STATE AND CONGRESSIONAL LEGISLATION.—The Van Ness ordinance passed by the common council of San Francisco, in 1855, granting the pueblo lands to persons in possession thereof, with the exception of lands reserved for streets and other public purposes, was provisional in its effect, and not operative *per se*, but derived its operative force from the ratification thereof by the state legislature and the relinquishment of the title of the United States to the city by Congress for the uses and purposes specified in that and other ordinances ratified by the legislature of the state.

ID.—TITLE OF POSSESSORS—OBLIGATION OF CONTRACT—PUBLIC SQUARE—ADVERSE POSSESSION.—The Van Ness ordinance granted only such title to possessors as the city was permitted by Congress and the state to convey; and it did not operate as a contract of the city with the possessors of land reserved as a public square, and so create an obligation beyond legislative impairment. Compensation was not required to be made to adverse possessors of part of such square; nor could title be acquired thereto by adverse possession.

ID.—RESERVATION OF LAFAYETTE PARK—ORDINANCE No. 845—VAN NESS MAP—DEDICATION TO PUBLIC USE.—The reservation of Lafayette Park as a public square, as shown upon the Van Ness map, was made ostensibly under the Van Ness ordinance and the supplementary Ordinance No. 845, and said map had been adopted as a city map by order of the supervisors, prior to the legislative ratification of the Van Ness ordinance, which included also the ratification of such supplementary ordinance and order; and by the operation of that ratification and of the act of Congress conveying the pueblo lands to the city for the uses and purposes specified in the ordinances so ratified, Lafayette Park was dedicated to

public use as a public square, and no possessor could acquire title to any part thereof.

ID.—DECREE CONFIRMING CLAIM OF CITY—POSSESSOR OF PARK NOT AIDED. The decree of the United States court confirming the claim of the city to the pueblo lands "in trust for the benefit of the lot holders, under grants from the pueblo, town, or city of San Francisco, or other competent authority, and as to any residue in trust for the use and benefit of the inhabitants of the city," did not aid any possessor of Lafayette Park, which had been dedicated by competent authority to public use, and who did not hold under any grant from the pueblo, town, or city.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from orders denying a motion for judgment on the findings and denying a new trial. J. M. Seawell, Judge.

The facts are stated in the opinion.

S. W. & E. B. Holladay, L. D. McKissick, and Jefferson Chandler, for Appellant.

Harry T. Creswell, City and County Attorney, and Gaillard Stoney, Assistant, for Respondent.

BRITT, C.—Plaintiff claims to be the owner of a half block of land lying along the south side of Washington street, between Gough and Octavia streets, in the city and county of San Francisco, and prosecutes this action to quiet his title thereto. Said half block is parcel of the lands to which the city, early in its history, laid claim as successor of the former Mexican pueblo. On June 20, 1855, the common council of the city passed Ordinance No. 822—the so-called Van Ness ordinance—the second section whereof proceeded as follows: "The city of San Francisco hereby relinquishes and grants all the right and claim of the city to the lands within the corporate limits to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, A. D. 1855, and to their heirs and assigns forever; . . . . provided, such possession has been continued up to the time of the introduction of this ordinance in the common council," etc. There were various exceptions of no present concern, and by section 4 of the ordinance the city reserved to itself "such lots

and lands as may be selected and reserved for streets and other public purposes under the provisions of the next succeeding sections." Section 10 of the same provided that application should be made to the legislature to confirm and ratify the ordinance and to Congress to relinquish the right and title of the United States to the said lands for the uses and purposes in the ordinance specified. On September 27, 1855, said common council passed Ordinance No. 845, providing, among other things, for the preparation of a plan exhibiting the streets and other grounds reserved for the use of the city, and to be selected and located pursuant to the former ordinance, No. 822. Thereafter, ostensibly under authority of said ordinances, a map or plan, commonly known as the Van Ness map, was prepared by a commission chosen by the common council, upon which was delineated as set apart for public use a square called "Lafayette Park," including the premises here in controversy; and on October 16, 1856, a body acting as the board of supervisors of the city and county of San Francisco (the act of April 19, 1856, consolidating the government of the city and county, having meanwhile gone into effect) passed an order in terms adopting the said map and declaring it to be the plan of the city "in respect to the location and establishment of streets and avenues, and the reservation of squares and lots for public purposes," in the portion of the city to which the same related. The selection so made of land for said park was after the time limited for that purpose by the ordinances had expired, and in some other important respects transcended their provisions.

The legislature of this state, by an act approved March 11, 1858, declared that the said ordinances and order "be and the same are hereby ratified and confirmed." (Stats. 1858, pp. 52-56.) By the act of Congress approved July, 1864, entitled, "An act to expedite the settlement of titles to lands in the state of California," all the right and title of the United States to the lands within the corporate limits of the city of San Francisco, as defined on April 15, 1851 (which included the site of said Lafayette Park), was relinquished to the city and its successors "for the uses and purposes specified in the ordinances of said city ratified by" the aforesaid act of the legislature of March 11, 1858; some reservations are specified in the act of Congress not

affecting the present case.   (13 U. S. Stats. at Large, p. 333.)
The court below found as a fact that under and by virtue of the
ordinances aforesaid, and the said acts of the legislature and
Congress, respectively, the land described in the complaint was
reserved and set apart and dedicated to public use as and for
the park aforesaid; also that the defendant is seised in fee and
entitled to the possession thereof in trust for the benefit of
the people of the state and of the city for the purposes of a
public park.   The court further found, however, that such land
has never been used as a park, and that defendant has never
had actual possession thereof, but that plaintiff is, and his pre-
decessors in interest ever since and long prior to January 1, 1855,
have been, in the open and exclusive possession of the land,
claiming to own the same as against the whole world.   The judg-
ment was that plaintiff take nothing, and that defendant is the
owner and entitled to possession in trust as declared in the
finding.

A fuller history of the legislation above mentioned, and of
the title of the city to the pueblo lands, and of the proceedings
for the selection of public grounds under the Van Ness ordi-
nance, appears in the reports of some of the cases presently to
be cited; notably in *Hoadley v. San Francisco*, 50 Cal. 265, 70
Cal. 320, 124 U. S. 639, which involved the right of the city
to portions of certain other squares upon circumstances sub-
stantially the same as those of the present case.   The plaintiff
here contends that many decisions which have been rendered
concerning the Van Ness ordinance proceed on a false assump-
tion, viz., that the ordinance became effective in consequence of
the statutory ratification thereof, and not of its own vigor.
Treating as void, upon various grounds, the attempt of the city
officials to dedicate the land to the uses of a park, his chief con-
tention is that the ordinance itself operated to convey the title
to his predecessors in possession at the time it was passed; that
the legislature had no right to ratify the ordinance, and no
right to ratify the order adopting the map; and this, he urges,
is a new question in this court.

It is unnecessary to investigate anew the nature and founda-
tions of the title of the city to the pueblo lands; no claim is
made that any private right had attached to the land in contro-

versy at the time of the conquest of the country in 1846, and the title, with that to other unappropriated lands of the pueblo, undoubtedly passed to the United States. (*People v. Holladay*, 68 Cal. 439, 443; *United Land Assn. v. Knight*, 85 Cal. 470; *Galvin v. Palmer*, 113 Cal. 52; *Palmer v. Low*, 98 U. S. 16; *United States v. Santa Fe*, 165 U. S. 701, *et seq.; United States v. Sandoval*, 167 U. S. 296-98.) True, the city, as successor of the pueblo, had an inchoate and imperfect right in the land, which was at length, with divers restrictions, confirmed by the United States; but, as has been often held, this was a qualified right—a trust for the benefit of the inhabitants of the city, and subject to governmental control. (*Hart v. Burnett*, 15 Cal. 530, 580, 581; *Payne v. Treadwell*, 16 Cal. 220, 233; *Grogan v. San Francisco*, 18 Cal. 592; *Baker v. Brickell*, 87 Cal. 334, and cases cited; *Board of Education v. Martin*, 92 Cal. 209, 217; *Ames v. San Diego*, 101 Cal. 392, 393; *Grisar v. McDowell*, 6 Wall. 363; *San Francisco v. Le Roy*, 138 U. S. 656, 667.) To what extent this power of control resided in the state of California, and to what extent in the United States, is a matter of no great importance here, since both governments assumed to ratify the ordinance substantially upon the terms imposed by the state. (*San Francisco v. Le Roy, supra.*)

The elaborate argument of the plaintiff is largely an effort to show that no reason existed for confirmation of the ordinance by any superior authority whatever. We attempt no exhaustive reply to the question, but may observe: 1. The city could alienate its pueblo lands only in accordance with the trust upon which they were held. (*San Francisco v. Canavan*, 42 Cal. 542.) As the city held the land in trust for all its inhabitants, the wholesale donation contemplated by the ordinance to persons who had no higher right than mere occupancy, without regard to the extent of their occupation, whether or not in excess of the building lots and patches for cultivation which the pueblo authorities might have alienated, certainly tended to subvert the trust with which the city was clothed; the power to make such a grant, if it existed in the city unchecked, might readily have created "a monopoly in the hands of a few of what was before the right of all." (*Hart v. Burnett*, 15 Cal. 568, 581; *Redding v. White*, 27 Cal. 285.) 2. The predecessors

in interest of the plaintiff, who were in possession at and prior to the time of the passage of the Van Ness ordinance, made no claim to the land under grant from any alcalde or other municipal authority; on the contrary, they occupied the land adversely to the city.  It is not apparent how the city owed a duty to, or was charged with a trust in favor of, persons who denied its title and with hostile intent invaded its possession. 3. The ordinance shows on its face (section 10) that the common council regarded the grant as provisional and subject to further legislative action. (*Hoadley v. San Francisco*, 124 U. S. 646.)  4. The paramount title being in the United States, and the inchoate title of the city being liable to modification by the government of the United States (*Grisar v. McDowell, supra*), the common council was incompetent by ordinance to divest that government of the power of such modification.  (See *People v. Holladay, supra; Board of Education v. Martin, supra; San Francisco v. Leroy, supra.*)  Upon whatever grounds the view is founded, it is certain that the courts have uniformly assumed that as an instrument for the transmission of title into private hands, the Van Ness ordinance derives its force from the legislation confirmatory thereof; and in some instances it has been distinctly so ruled.  (*Valentine v. Mahoney*, 37 Cal. 389; *Hoadley v. San Francisco*, 50 Cal. 265, 273; 70 Cal. 320; 124 U. S. 639, 646.)

It appearing that the ordinance was of its own force inoperative to convey the land in contest to plaintiff's predecessors, the result is, as remarked in the case last cited (124 U. S. 646), that "The ordinance granted only such title as the city was permitted by Congress and the state to convey.  In its legal effect the act of Congress conveyed the lands to the city for the uses and purposes specified in the ordinances and the order of the city ratified by the act of the legislature.  In this way the . . . . squares as designated in the report of the commissioners . . . . were dedicated to public use." (*Sawyer v. San Francisco*, 50 Cal. 370; *People v. Holladay*, 93 Cal. 241; 27 Am. St. Rep. 186; *San Francisco v. Mooney*, 106 Cal. 586.)

Plaintiff further argues that "one of the most vital and controlling questions in the case is, What effect is to be given to the decree of the United States circuit court of the 18th of May,

1865, confirming the claim of the city to the pueblo lands?" Inasmuch as that decree contained a declaration of its own purpose, as follows: "This confirmation is in trust for the benefit of the lotholders under grants from the pueblo, town, or city of San Francisco, or other competent authority, and as to any residue in trust for the use and benefit of the inhabitants of the city," and since, as has appeared, the land in dispute was not granted to plaintiff's predecessors by the city, but on the contrary was dedicated by competent authority to public use, we cannot think he is aided by said decree. (*Mills v. Los Angeles,* 90 Cal. 523; *United States v. Santa Fe, supra.*) Other views advanced by plaintiff are either sufficiently covered by the foregoing remarks or have been ruled adversely to him in previous cases; it is so of his contentions that the Van Ness ordinance was a contract between the city and the possessors of the land, and not subject to legislative impairment, that dedication could not be made of the city's land held in adverse possession, and that compensation to the persons in such possession was necessary (*Hoadley v. San Francisco,* 70 Cal. 320, 325; 124 U. S. 639, 646; *Sawyer v. San Francisco, supra; Mills v. Los Angeles,* 90 Cal. 522); and that irregularity or invalidity of the proceedings of the commissioners who selected and mapped the land as a park was beyond the curative power of the legislature (*San Francisco v. Mooney, supra,* and cases cited); and that he has acquired title by adverse possession (*Hoadley v. San Francisco,* 50 Cal. 265; *Board of Education v. Martin, supra; San Francisco v. Bradbury,* 92 Cal. 414.)

We are aware that this opinion is for the most but a digest of the results of past litigation; we have, however, upon the urgent insistence of plaintiff given attentive consideration to the grounds upon which rest some of the more important decisions cited, and perceive no sufficient reason for recommending the disturbance of any of them. The judgment and orders appealed from should be affirmed.

Chipman, C., and Haynes, C., concurred.

For the reasons given in the foregoing opinion the judgment and orders appealed from are affirmed.

Garoutte, J., Henshaw, J.

VAN DYKE, J., concurring.—I concur in the judgment for the reason that the questions involved in this case, by repeated decisions, both of this court and the supreme court of the United States, have become settled, and should not now be disturbed.

Hearing in Bank denied.